v. FEDERAL ENERGY REGULATORY Good morning. Thank you, Your Honor. Lisa Belenke for the appellants, the petitioners, San Bernardino Valley Audubon Society and California Trout. This case concerns Mill Creek, which is a small perennial creek which is sourced in the San Bernardino Mountains. Along its length, Mill Creek supports habitat for many species, including the endangered southwestern willow flycatcher and other riparian-dependent species. However, for over four miles of its length, Mill Creek is completely dewatered by a diversion near Forest Falls that takes out the water for power production. This situation has prevailed for over a hundred years. We're here today because FERC has licensed the same project under the same terms so that the same situation will prevail for the next 30 years. We have many issues in this case, and I forgot to say I want to reserve five minutes of my time for my bottle. We have many issues in this case, and I would like to begin with the Endangered Species Act issues. Both FERC and petitioners have submitted subsequent authority to this court on these issues. We have, there are basically two parts to the Endangered Species Act issue. The first is whether as an initial matter, FERC failed to ensure that the species, the listed species in the area would not be jeopardized by the project. And on that question, the briefing is quite clear. Petitioners provided reliable evidence that the Southwestern Willow Flycatcher had been observed in the bypass reach, and all parties agree that the Southwestern Willow Flycatcher is in the project area in general. Nonetheless, FERC made a determination that the project was not likely to adversely affect the Southwestern Willow Flycatcher. Well, be specific when you say provided evidence. It seems to have come in piecemeal, bit by bit. What was the first indication that the flycatcher was in the affected area? Well, in the affected area, all parties agreed that it was, and that was in the original... Well, but the first thing that came in is that somebody had seen the bird there, right? And then the next question was, well, was it there during the nesting season? Yes. You're talking about whether it was in the bypass reach itself. Yes, that's true. First, FERC said that their determination was based on the fact that the flycatcher had not been in the bypass reach. Then petitioners submitted evidence by Gerald Braden, who is a surveyor for the Forest Service, and is well known as being an expert in this area, that said that he had seen the flycatcher in the bypass reach. Right, and what was the next chapter? Then there was a rebuttal saying, well, you didn't say which dates it was precisely so that you could be sure that it was this flycatcher. And then what happened next? And then there was another submittal saying that he confirmed that it was during those dates. Was that a submission by him in a declaration form? I believe it was not at that time, but it was later submitted. No, that was simply a statement that he'd authorized you to represent X, Y, and Z. I believe that's correct. And then at that time, there wasn't a declaration to fill in that blank. I believe that is correct, Your Honor. However, the question of the probative, the relevance of the evidence, its probity, and the expertise of the surveyor are questions that should have been analyzed in a consultation context. Instead, FERC did not inquire further. They were invited to inquire specifically with Gerald Braden and with petitioners. What we had asked in that case was for FERC to move forward with a consultation with the Fish and Wildlife Service, and they refused to do so. Why, you know, I mean, I'm not criticizing, but why wasn't a declaration from him immediately forthcoming? I was not working on the case at that time. I can't tell you the exact circumstances. See, this is what happens. I know. I do understand that. It is frustrating. I believe that it was hard to get ahold of people, and there was some problem getting it in an immediate manner. As I said, we need to, nonetheless, there was the petition. But the proponent of a position usually has the responsibility to back the position up with something more than just hearsay. I think that's true, Your Honor. However, under the ESA, FERC has an affirmative duty to ensure that the project does not affect, adversely affect listed species, including jeopardizing the species known to exist in the area, the southwestern willow flycatcher. We believe it was also FERC's duty to affirmatively inquire further, and to open a consultation on that issue. In the rehearing order, the Orient denying rehearing, FERC comes back again, even after another declaration was provided by Gerald Braden, and says that they did not, because it did not include his actual field notes, they were discounting it. And I think this points up something that happened. What page is this in the order denying rehearing? Oh, I have to pull out the order. Okay. Well, just go ahead then. I'll find it. And in fact, they state that it didn't provide conclusive proof, was, I believe, the statement that they used. And conclusive proof is not necessary under the Endangered Species Act. In order to open a consultation. Nonetheless, I want to now move on to the second issue, which is the critical habitat designation. Critical habitat was designated for the southwestern willow flycatcher in Mill Creek, including in the bypass reach, in October of 2005. I believe it was October 19th. That's long into the process. It was long into the process, but the process was still ongoing. On October 20th, FERC issued the denial of the rehearing. And also, and within five days after that, issued another order regarding the BIRM issue and the correction of the basic project description. You said BIRM issue, I just wanted to... BIRM, B-E-R-M. Yes. And indeed, even seven months later, in May 2006, FERC issued another order. The amount of Forest Service land that had been listed was incorrect, and accepting the final map on the BIRM issue. So during this entire time, the license was still being reviewed by FERC. FERC was still taking action on the license. And FERC was fully engaged with the process. Therefore, the case that FERC has provided to the court, California Sport Fishing Protection Alliance, does not apply here. In that case, the court was concerned that FERC was no longer acting affirmatively with respect to the license, and that the license had been issued decades before. That is not the case here. In this case, once critical habitat was designated in Mill Creek, specifically in the bypass reach, which was known to be affected by this project, FERC was under an obligation under Section 7 of the ESA to open consultation and to ensure that the critical habitat was not destroyed or adversely modified by these actions. I'd like to move on now to the Forest Service issue. Petitioners also challenged the Forest Service issue, alleged that the 4E conditions were not sufficient to adequately protect the reservation. There's, FERC has raised many issues here, but I would like to move directly to the substance of it. The conditions that the Forest Service provided, Condition 6, fails to provide any surface flow in this creek, fails to provide any restoration for the creek, although it is clear that the forest plan itself stresses that riparian areas should be managed for many other uses besides power, in addition to power, such as wildlife, water recharge, flow needed for other beneficial in-stream uses such as fish, and specifically threatened and endangered wildlife. I'm not a scientist, but I read through this a whole lot, and it sounds like the flow that's been approved is pretty minimal, and your position is it's not even close to enough to support the interest that you're interested in, and you want a 6 to 7 CFS per second flow. That's correct. Rather than the leakage flow. But I've read all of this information. I don't see how that helps you one bit. That doesn't get where you want to go, either with respect to birds or fish. Respectfully, we believe that the record does show that it does improve the condition of the creek. Improve, but so marginally it won't make a difference, and that's sort of generally what the other side seems to have said. Okay, you get a couple more CFSs in there, but that's not going to help the vegetation. You have floods, it wipes everything out, and it isn't going to materially contribute to the success of fish or birds. Petitioners have submitted evidence that it will materially contribute to an increase in vegetation in the bypass breach. Yeah, but not enough to make a difference. The difference between what's going on for a hundred years, and 6 and 7 compared to 20 or 24, their judgment is, based on all the evidence submitted, that that simply doesn't get you anywhere. It's so marginal that it's not worth the decrease in the power output of this plan. I understand that that is FERC's position, and I understand what you're asking. However, one of the issues in this case is that petitioners submitted evidence that that is not correct, that it would materially improve the condition of the bypass breach. They don't have to buy that, though, and I agree with you that the first time around, it might appear to somebody that they just bought FCE's evidence and totally ignored yours. But in the order of denying rehearing, I mean, they really get into the details in large measure. Maybe not sufficient as far as you're concerned, but they say, here's why we don't buy the arguments from the other side. In fact, they do not really get into the evidence to the extent that we feel is necessary, because one thing they never do with the competing scientific evidence is they never look at the reliability of the experts. They never look at the methodology of their studies. How do you know the Commission staff didn't do that? Well, it's certainly not evident anywhere in this record. It is not evident in the order on rehearing, and it is not evident in the original order on the license. And this decision can be upheld only on those bases. We cannot reach back to some issue that FERC has not put in those licensing orders. As far as this record shows, they did not grapple with this scientific evidence. There is clearly a disputed scientific issue, several disputed scientific issues, and they did not grapple with it on the basis of science. They simply chose one over the other. And that is what we say undermines their claim that they had substantial evidence for their decision. You think six to seven CFSs is going to support some kind of a trout population? It may or may not support a cold water trout fishery. That is not the only value of this creek. Wildlife habitat, additional riparian vegetation will... You concede it may not. That's a meager minimal flow for the fish. But trout populations are not the only issue here. Oh, I know. I know. In fact, the Southwestern Willow Flycatcher... Okay, but I'm looking at the... Well, the flycatcher doesn't seem to have been bothered for a hundred years. I mean, if he's still there... Well, the flycatcher is listed, is a listed species. I appreciate that. And he's in very bad shape. And actually, recovery habitat, one of the reasons for listing this area as critical habitat is to provide recovery for the species. In fact, in Gifford, Pinchot, this court specifically recognized that the purpose of critical habitat is to provide for recovery of the species, not simply to treat them as... Is upstream from the diversion critical habitat for the Southwest Willow Flycatcher? Much of it is, as well as downstream, as well as... And how many miles does the upstream? I believe it's 11 miles total. And we did... And the area that you're concerned about is how many miles? Four miles. Four miles. And below is critical habitat. That's right. How many miles is that? I don't know how far below. I'd have to take out my map and measure. Several miles. Past forest, past mountain home, and Thurman Flats. Basically, there's a gap in the middle of the creek that's been created by this diversion for a hundred years. Yeah, and there's no water there, basically, is what you're saying. There is water in high flow times, like in the winter during flood flows, and at other times of the year, intermittently. There's not consistent perennial flow. Notwithstanding these dire circumstances, the flycatcher is nesting there anyway, is that right? Not in the bypass reach. Not in the bypass reach. The flycatcher nests above, by the diversion, and below, by mountain home and Thurman Flats. What does Braden tell us about the flycatcher in the diversion area, the four miles? Braden specifically says he has seen them foraging there, I believe. So they do use the area, and it is now designated as critical habitat. And on that basis, because FERC was still... Yeah, exactly when did that come into play, when it was designated as critical habitat? October 19, 2005, the day before the order on rehearing was issued, which FERC took over two years to issue. In your view, what does that add to the equation, and what does that require? Once critical habitat is designated, FERC, under the ESA, must also ensure that the action it's licensing does not destroy or adversely modify critical habitat. And through consultation, it should ensure that. It should have open consultation with the Fish and Wildlife Service on that basis. Indeed, one of the Fish and Wildlife Service's letters specifically stated that the reason they were recommending the same 6-7 CFS flow that petitioners are recommending is for recovery of the species in the area, including the Southwestern Willow Flat. By letter of August 27, 2002, FWS concurred with staff's assessment, stating that future direct and indirect effects of project operation over the license period are not likely to reach. Here's some critical language. However, FWS stated that if any listed plant or animal species were found in the bypass reach during the license period, consultation should be initiated to ensure that project operation does not jeopardize the continued existence of the species. I read that to suggest that if all of a sudden the license is issued and the flycatcher pops up, that you've got to get into consultation. Is that right? I believe that that is correct. Are you there? However, already, what that letter does not contemplate is the designation of critical habitat, which was an independent decision by Fish and Wildlife. And now you've got a designation. And happened after that letter. And now you've got Brayden's declaration. So aren't you there and to consultation and connection with the operation of the project? We believe that they must consult. Have you started that? Has Burke started the consultation? No. Have you asked for it? It is not up to petitioners to ask. It is the duty of... I'm just asking, have you? I mean, you're trying to protect the bird and the fish. I believe that Burke knows that we believe that they should consult. We certainly put it in all of our briefing. I did want to address... I see I only have three minutes left. I did want to briefly address the berm issue. In the rehearing order, Burke specifically states that the project description. Nonetheless, in its rehearing order, it concludes that it will not reopen its environmental review or otherwise. Burke gives them no reason for that. I'm dense. I don't understand the berm issue. Explain it to me. Well, it has to do with the actual project works and that there was a long area of rubble and dirt that is used to direct the flow out of the natural stream bed and into the project works. In the original license, it was described inaccurately. In fact, it was never said in the original license that the licensee also maintains the berm by work that it does in the stream bed to rebuild it when it is destroyed or partially destroyed by floods. Those issues were never evaluated in the environmental review, were never presented to the state water board. We believe that that is incorrect under both a Federal Power Act analysis as well as a simple NEPA analysis, which says that an accurate and stable project description is absolutely essential for any NEPA review of a project. I'll reserve my last almost two minutes. Thank you very much. Thank you, Counsel. Good morning. I'm Carol Banta for the Commission. The respondents and interveners have agreed to share our time, so I will be speaking for 13 minutes. John Bryson will argue for the Forest Service for four minutes, and Beth Collins-Burgard will argue for the interveners for three minutes. I would like to begin just with the last berm issue, because I hope we can take care of that pretty quickly. That issue, the berm issue that the petitioners have raised, or a form of it, not the environmental and state water board arguments they're making now for the first time on appeal. They raised some questions about the berm in a footnote in a rehearing request, which isn't really enough even to trigger being addressed. Nevertheless, the Commission investigated it, fully investigated it, addressed it for the first time in the rehearing order. To the extent that the petitioners had any issue with what the Commission said in the rehearing order, they were obligated to seek rehearing of that determination. You can seek rehearing from a rehearing order when the Commission makes a new determination with a new rationale. That is a prerequisite for appeal. That is jurisdictional. It is not waiver. It is not exhaustion. It is FPA Section 313, jurisdictionally precluded from being raised on appeal. So that is not properly before this Court. Turning to the ESA issues with the Cal Sport Fishing Protection Alliance case, petitioners' effort to distinguish that just can't be squared with the opinion in that case. That case did not depend on the fact that some time had passed. The license was issued. That is the agency action. Under the resource agency's regulations, the definitional regulations for ESA Section 7, 50 CFR 402.02 gives examples of agency actions. The action is the issuing of the license. This license was issued in July 2003. Edison has been operating pursuant to that license since 2003. That action was completed. There are ongoing amendment issues here and there or compliance throughout the life of a license. But the California sports fishing case recognized that the agency action is the issuing of the license. In some of the cases involved in that, I don't know if they all came up in this case, but Sierra Club versus Babbitt, that was the granting of a right of way. That was the agency action. Section 7, A2, is about whether there has to be an action. The California sport fishing case said that the ongoing operation of a dam that has been licensed is not agency action for purposes of Section 7. In that case, a license had been granted. At some point later, a new species was listed. That did not trigger mandatory formal consultation under 7A2. Now, in the ongoing operation of these kinds of projects, there may be informal consultation. I think as we discussed in the argument in that case, the commission doesn't issue the license and just walk away. There's an ongoing process with the licensee and the various resource agencies. There often will be consultation. New species get listed. Here, what happened was the critical habitat was listed. There is an ongoing effort, because everyone is interested in protecting the listed species. Saying that it's a failure of Section 7A2 to engage in required formal consultation is a different question. California sport fishing is dispositive. It specifically looked at whether Article 15, standard Article 15, which is in all these hydro licenses, whether that constituted discretionary federal involvement or control under the regulations for Section 7, and it just isn't. That case on bunk rehearing was denied, and that's the law in that case. On the other EASA issue, the original, the consultation, or the informal consultation that ended with the not likely to adversely affect determination, I just want to emphasize Fish and Wildlife Services' involvement in that. This was not FERC on its own saying, well, we don't think it's likely to adversely affect the species. The relevant natural resource agency was involved. There was no information that FERC had about what Mr. Braden was saying that Fish and Wildlife Service didn't also have. Fish and Wildlife Service is the one that said if you don't see them during the nesting season, they're not known to occur in the bypass reach. Let me emphasize, the flycatcher is known to occur, and everyone agrees, in other parts of the same project area. The reason that Fish and Wildlife Service concluded that the license was not, or the agency action of issuing the license was not likely to adversely affect the flycatcher is because the three quarters of an acre parcel of riparian vegetation that Edison is to create, as well as the rewatering of the lower, the mill two bypass reach, because of the decommissioning of the mill two dam, would actually benefit that species. I don't think there's been any dispute as to that. Some parts of the project would actually benefit the species, and because no flycatchers were known to occur within the mill three bypass reach, that part of the project was not likely to adversely affect. I don't think we're arguing that it would actually be beneficial. The problem that I have is that it appears that there's an obligation, affirmatively, to check out these things under the ESA, make sure we're not doing any unnecessary damage. It looks like from reading all this stuff that your side was just dragging its feet. The other side would come in and say, hey, time out. We've got a guy who's an expert who's seeing the bird here, there, and everywhere, and you just keep coming up with, not you personally, but reasons why we're not going to pay any attention to that, rather than saying, uh-oh, if the bird's there, we've got to check it out. Not the commission. It was Fish and Wildlife Service saying that in its letters, that these are the protocols, and this still doesn't give us any reason to change what we said before. The petitioners seem to argue that we needed to produce affirmative evidence of absence, and if that were the standard, I guess instead of trying to identify what species, what listed species are potentially affected, we would get a list of all listed species from Fish and Wildlife and try to knock out which ones we can affirmatively conclude aren't there, and just assume that everyone else is. So you're saying, what do you want from us? It was FWS that... Well, it was working together, but we certainly do work with Fish and Wildlife and rely on them and their expertise in evaluating the evidence that is in the record, and in their briefs, the petitioners cited a couple cases to say that the commission can't rely on Fish and Wildlife Service. Those cases, one's called Resource Center, and the other one, I'm suddenly drawing a blank, in those cases, the resource agency didn't have some information that the action agency had, wasn't sharing all the evidence or had some knowledge that it hadn't shared, so in that case, in those cases, the court said, well, you can't say you're relying on Fish and Wildlife or NOAA Fisheries or whichever entity if they don't even have all the information, but here, Fish and Wildlife was in, if anything, a better position, so working together, both agencies said, as the language in 50 CFR 40214 is, to determine whether to move to formal consultation, you begin with informal consultation, which we had here, and when the resource agency issues an opinion that it is not likely to adversely affect the species, formal consultation is not required, that's how the regulation works. What happens when all of a sudden this is designated as critical habitat? I think there could be some consultation going in formally, but to say that it's required formal consultation gets you to California Sport Fishing again. This license was already issued, there's no proposed agency action. Has the license already been issued, or is it still in limbo, because it's... It's not in limbo, because under FPA 313C, an order of the commission is not stayed pending an appeal. Edison's operating under this 2003 license, they're not still operating under annual... You do not stay these pending appeal, here we go, and it can be ordered... Certainly not automatically, and it wasn't done in this case, I don't know if it was that is going on now. The critical habitat designation apparently came out the day before the rehearing order. The rehearing order didn't change anything, it's not an agency action, it's a reaffirmation of the agency action that already happened, and of course they haven't presented any argument about agency action, so we haven't briefed it, so that's sort of a new issue, but they haven't argued that the rehearing order is somehow a separate agency action in itself, but it didn't change anything. In any event, of course that rehearing order had been in process, I'm sure the commission didn't even know about the critical habitat designation that happened the day before, but my understanding is that that designation actually became effective a month later, so after the rehearing order, so even if there were some way you could say that the rehearing order was part of the agency action, it still was completed before this critical habitat came into effect, and that's not to say that the parties including the licensee aren't making an effort to protect this species, but the question of whether there's actually an ESA violation and an obligation to affirm that we do something is a very different legal question, and we have all of these hydro projects and species are being listed all the time, and as I think the court recognized in California sport fishing, at some point you could just be requiring formal consultation all the time. I did want to get to the substantial evidence issue since that's such an important part of the case, and I want to emphasize the role of the agency and the staff in doing the environmental assessment as well. This is not a situation where a judge takes competing expert evidence and has to evaluate it all and choose who has a preponderance of the evidence and who's right. This is an expert agency with expert staff that in the environmental assessment performed, and they said in it, an independent analysis using their professional business judgment. The commission has biologists and engineers and technical experts on staff, and if you look at the end of the EA, the people who prepared it are people who know the science, and the EA goes very much into the science. They don't accept what's fed to them by a party. They take all the evidence in front of them and inform the commission. So I just want to clear up that staff includes some scientific experts. It's not a menial staff preparing something for a commission that may not know much about it themselves, and this is entirely consistent with the statutory scheme. The FBA puts this responsibility for discretion to take all of these conflicting interests, all of these parties, various state, federal agencies, interested parties, licensees, environmental groups, consider all of it and weigh all of it and develop a comprehensive plan that in the commission's judgment represents the best use of the waterway. And then it gets conditions from other agencies under 4E, they're mandatory. Under 10J, and there's no 10J argument, a violation of 10J here, but 10J is where the federal, the U.S. Fish and Wildlife, the California Fish and Game, I know I'm getting their name wrong, put in conditions. Those are not mandatory, but they are, Congress knew what it was doing. In 10J, it says the commission must base its conditions on these recommendations. If it rejects the recommendations of these agencies, it has to very specifically explain why, on what basis, try to resolve it with those agencies, and if they agree to disagree, the commission still has to explain why those conditions are inconsistent with its comprehensive plan under 10A, and why the conditions it adopts instead serve the same purpose. The commission did that here, and there's no argument on appeal that they didn't. And then there's the 10A2, which I know Petitioner didn't get a chance to talk about the comprehensive plans, but those are just to ensure that the commission is looking at everything it's supposed to be looking at, but it doesn't ensure consistency, it just says you need to consider this. It puts this all within the agency, the discretion given by Congress based on the expertise, and limits the review both through the jurisdictional prerequisite for a hearing in 313, and the substantial evidence standard, and I'm afraid I'm eating into the Forest Service's time, but I want to emphasize, it's not a preponderance, and the Bear Lake Watch case from this circuit has the best explanation, that even if this court thinks, as an original matter, that it would come out differently, it still upholds the commission if there's more than a scintilla of evidence that supports the commission's view. And so the commission not only, and the petitioners concede repeatedly in their briefs that the commission made extensive factual findings, the commission considered our evidence as well as Edison's evidence, even if the commission relied entirely on Edison's submittals, such reliance wouldn't necessarily be wrong, they can see all of this, they just say, but our evidence was better. Well the commission spent, I believe, 18 to 20 paragraphs in the hearing order going above and beyond what it needed to do to explain why, no, their evidence wasn't better, it was highly speculative, and not just marginal, as Judge Trout referred to, but not only marginal, but even speculative, they would have that marginal impact. This is the role and the discretion that's given to the agency, and with the petitioners' own concessions, especially in their reply brief, that the commission considered and weighed competing interests, and it considered our evidence, it just didn't buy it. Counsel, you're seriously eating into your counsel's time, all right. These are very tricky issues. The projects displaced fossil-fueled electric power generation that the region now uses, thereby conserving non-renewable fossil fuels and reducing the emissions of noxious byproducts caused by fossil fuel combustion. So water, you don't burn coal, or put in a nuclear power plant. I mean, there's so many values that are flying into the center of this thing, it's very tricky. Yes, it is indeed, but in the statutory scheme for the Federal Power Act, and Congress placed the initial and basically determinative responsibility to resolve all those with the agencies here. Remind me again who you represent. I am John Bryson with the Department of Justice, representing the Forest Service on the petitioner's challenge to the four E conditions, which the Forest Service submitted to FERC. And our first submission is that there's no Article III case of controversy here. They were taken out. They were not put in the license. They were not put in the license, that's correct. So because they were not put in the license and there's no party here that challenges FERC's decision not to put them in the license, and petitioners concede in their reply brief that they're not bringing such a challenge, then we have a fatal concession as to being able to get review of the Forest Service decision. And that stems from this Court's recognition in California, to save our streams, that the Forest Service's four E conditions don't have any independent legal significance outside of being incorporated into the license. Since they weren't incorporated in the license and no one is challenging the fact that they weren't there, there's no effective relief that this Court can grant against the Forest Service that would benefit the petitioners. And so in our view, the petition for review should be dismissed for a lack of a justiciable controversy. If there are no other questions with respect to the Forest Service solved. I understand that part of the case. Thank you. May it please the Court, Beth Collins for guard of Latham and Watkins for Southern and at the last minute arguing for Nino Mascalo, who had a huge family emergency. So as of 5.30 p.m. yesterday, I am arguing today. David Moore and David Alige, excuse me, are here as well for the water intervenors. So we are the intervenors. So I can give you some context about the real, the project, and what's gone on a longer view. So a couple things I want to hit. Number one, participation. This licensing process started back in 1991, okay, and went to 2003 when the license was issued. All throughout this process, multiple agencies and petitioners have participated. So it's been about 15 years, this process of participation, that everyone has had an opportunity to bring in their thoughts, add evidence to the record, an opportunity to participate, all throughout this process. Multiple site visits we've hosted. In fact, Audubon's own property is just a little south of the dam. So everybody knows what's going on here, and it's been going on since the early 1900s. So, and everyone's had a chance to participate, and everyone's had a chance to present their sides of the case. So with that, it is surprising that the petitioner is saying that the FERC has not grappled on the basis of science with these issues. Because, in fact, I think if you read, and I'm sure you have, FERC's multiple orders, the EA, the actual licensing order, the petition for re-hearing, the order on re-hearing, there's significant grappling with scientific issues. Hydrogeology. Just to give you a picture, this stream is about the width of this room, whereas the channel, oftentimes of water, would be just about the size of this podium. And storm events come through, scrub through the stream, and the actual channel will vary over time, and it can be anywhere in the larger bed. So we have a very dynamic stream. FERC talks about that. We have a very steep canyon, and that's why hydro, it was targeted for hydro back in the 1900s, because it's a very steep canyon, so the water comes through very quickly. We have something that's very unique to this, the soil in this area, which causes stream bed sealing, actually, and that's discussed by FERC in their order. The stream bed sealing actually stops water to get into the groundwater, the surface groundwater. So you have multiple, in order for plants to survive, my understanding, not being a PhD, is plants need water to get into their roots to be able to survive. That's my basic understanding. In order to have that, they have to have surface water. And in order to have surface water, and this is discussed in detail by the FERC scientists in the order, but in order to have surface water, you actually need, in this area, because of the stream bed sealing, you're not getting it all the time coming down through the stream bed, so you actually need an upwelling of groundwater, and so you actually need groundwater to be perched on a bedrock and be pushed up, okay? And that's how we have plants that can survive. It's not from the stream bed, who today it can be here, tomorrow it can be over there, and the next day it can be over there. So that is why this dynamic stream bed, the steep, the science that was grappled with is not just, did I happen to, on Tuesday, see a flycatcher fly by? It is the hydrogeology of the area, the riparian vegetation, and what it takes for that riparian vegetation to survive. So I disagree with the petitioner's statement that there was not significant grappling with science. And I'll point out, as well, that there's a lack of grappling in a number of Brayden's declarations. In the 2002 declaration, it says, while I have not seen any flycatcher nests in the bypass reach, I have often seen and heard flycatchers in the bypass reach during spring migration. Doesn't say when, doesn't say sample size, doesn't say subspecies. Isn't that enough to reinitiate the consultation? You don't have to have a plethora of science just to reinitiate the consultation process, do you? Actually, you can issue a license, even with the presence of the endangered species there, if the Fish and Wildlife and FERC find that it's not likely to adversely affect the species. And we have that finding, we have multiple findings. And they did go back after Brayden's second declaration was submitted, the Fish and Wildlife went back again and issued another NLAA finding. And so there have been multiple looks at this. And in fact, FERC and the Fish and Wildlife found this project to be beneficial. Because one other thing I haven't told you about this stream, with the gaining and the losing reaches, so where you have this upwelling, you have enough groundwater to survive. Where you don't have that upwelling, there isn't going to be enough. You can pour water down that stream, there's not going to be enough, due to the stream bed ceiling and other issues discussed at greater length in the FERC orders. So you aren't going to have enough water here anyway. So the reason we know that is because upstream we have Cienegas, where there are gaining reaches. Downstream we have Cienegas, where there are gaining reaches. But in this bypass reach, there are not. All right, Council, you've exceeded your time. Thank you very much. Thank you so much. Rebuttal? Thank you. I'm not going to respond to the discussion just previous, because I believe that the record clearly shows that there's significant scientific controversy in this case. And I am not a PhD scientist, and I do not want to burden the court with my personal views. The fact is the record shows that there is scientific controversy as to whether flow in the reach would be beneficial to vegetation and to other values in the stream. We've heard from the other side that the Commission staff isn't your regular kind of a fact-finding operation. That the Commission staff is comprised of many different experts and people whose job it is independently, taking into consideration all the information they have to come up with some conclusions. Do you disagree with that about the Commission staff? The Commission staff may indeed have experts on it. However, neither the license nor the rehearing order shows any evidence that they grappled with the scientific evidence on a scientific basis. I've read all this stuff, and it looks like that's exactly what they were trying to do, figure out what their responsibility is and what all the factors are that weigh on the various decisions, and then come up with an appropriate decision. We believe that the record shows that they repeatedly accepted without any critique of the science. Where does it show that? I mean, you want a level of detailed discussion that might not exist, but we hear this all the time. The judge failed to consider what I put in my brief. That's not right. The judge considered it, came up with a decision, doesn't specifically go down sentence by sentence and say, this sentence I've considered and it's no good because of X. They take in all the information, they consider it, and here you go. And to me, this case sounds like that's exactly what happened over a long period of time. The outcome wasn't one that you particularly like, but it seems to me that they did consider all of this and use their independent information and expertise to do what the Commission was supposed to do. We respectfully disagree. I see that I'm out of time, but I would like to just respond to the Forest Service, if I may, on the jurisdictional question. Petitioners did raise the issue that FERC had failed to include all of the four E conditions in the petition for rehearing. Since that time, City of Tacoma, which also was submitted to this court, was decided by the D.C. Circuit, which says specifically that FERC must accept all four E conditions. And since that time, FERC, in other orders, has conceded that it must accept all four E conditions. Petitioners did not specifically appeal on that basis because it would have contradicted our appeal of the Forest Service's failure to provide adequate conditions. We would have had to both appeal the Forest Service's providing a Condition 6 that was inadequate and say that, nonetheless, FERC must have included it. And that was simply a contradictory position that the petitioners did not put themselves in. But you did. But this is the only forum in which the Forest Service conditions can be raised. That is quite clear under all of the case law. We could not have, then we would have been faced with people saying that we were contradicting ourselves. You want us to put in this condition that you don't even agree with. Really? I mean, you're clever enough to say if we didn't commit the robbery, but if we did, we were crazy. Well, not knowing the licensee's state of mind or anyone else's in this case, I really can't say. But I did want to say that we believe that this court does have jurisdiction to hear our claim to the Forest Service. The Forest Service did not hear our appeal. And we would like this court to decide on that issue. Lastly, I wanted to just make two very small points. There is no evidence, although FERC has said that it's making an ongoing effort to protect the species, there is no evidence on this record that it has reopened in either formal or informal consultation. And restoration of this creek is possible. That's what I want to leave you with here, is that both the State Water Board, Fish and Wildlife Service, Department of Fish and Game, and petitioners all believe that 6 to 7 CFS in this creek will improve the quality of the creek, improve vegetation, improve water quality, and other values. And that is possible. It should not be an all or nothing decision. California Sport Fishing. Are we dealing with a license that's already been granted? I believe this question of the agency action is a complex one. However, in this case, the agency issued two subsequent orders, subsequent to the critical habitat designation, that specifically amended this license on very basic facts. The actual project works, what they were, what kind of maintenance is done, and even the amount of land in the Forest Service that was occupied by the project. Clearly, staff was still engaged in acting on this particular permit. This was not something way down the line where it had been operating. It was directly responding to our re-hearing order that this issue was raised, as to the action of the agency on this particular license, and during that time, critical habitat was designated, and therefore, the agency should have reopened consultation on that basis. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Trott, Rawlinson, King